IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| **KAYLA RUSH,** *individually and as Daughter and Next Friend of Cindy M. Arnold* | § § § § | **PLAINTIFF** |
| **v.** | § § § | **1:19-cv-946-HSO-RPM** |
| **JACKSON COUNTY,** *by and through its Board of Supervisors, d/b/a Jackson County Adult Detention Center, et al.* | § § § | **DEFENDANTS** |

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS [98][100][102][104][108][110] FOR SUMMARY JUDGMENT

BEFORE THE COURT are the following Motions for Summary Judgment: (1) Motion [98] for Summary Judgement filed by Defendant James McCoy ("McCoy"); (2) Motion [100] for Summary Judgment filed by Defendant Cendall Huynh ("Huynh"); (3) Motion [102] for Summary Judgment filed by Defendant Jamie Weeks ("Weeks"); (4) Motion [104] for Summary Judgment filed by Defendant Jeremy Bobo ("Bobo"); (5) Motion [108] for Summary Judgment filed by Defendant Chad Vidrine ("Vidrine"); and (6) Motion [110] for Summary Judgment filed by Defendant Kristofer Gray ("Gray"). These Motions are fully briefed.

After due consideration of the Motions, the related pleadings, the record, and relevant legal authority, the Court finds that Defendants' Motions [98][100][102][104][108][110] should all be granted and Plaintiff Kayla Rush's

claims against Defendants James McCoy, Cendall Huynh, Jamie Weeks, Jeremy Bobo, Chad Vidrine, and Kristofer Gray should be dismissed with prejudice.

## I. BACKGROUND

### A.   Factual background

On September 8, 2018, Cindy M. Arnold ("Arnold") was arrested by the Jackson County Sheriff's Office for violation of a protective order and was transported to the Jackson County Adult Detention Center ("JCADC") in Pascagoula, Mississippi. 1st Am. Compl. [29] at 10-11. Arnold was booked into the JCADC by Defendant Officer Cendall Huynh who performed a medical intake screening. *Id*. at 11. Arnold informed Officer Huynh that she was a diabetic and that she had "seizures, epilepsy, heart problems, and a blood clot in her leg." Ex. 8 [118-8] at 4. Arnold also advised Officer Huynh that she took medications, but she could not provide him with their names. *Id*. Officer Huynh noted that Arnold appeared to be under the influence of an unknown substance. *Id*.

When Officer Huynh completed the booking process, he attempted to escort Arnold to pre-classification, *id*. at 3, but she was non-compliant and refused to walk, which forced Officer Huynh to place Arnold in hand restraints and house her in an isolation cell, *id*. Specifically, Arnold refused to pick up her jail issued mat and was "verbally aggressive" toward Officer Huynh. Ex. 3 [118-3], Officer Huynh's MBI Interview, at 7:25:40-7:26:30. Arnold was eventually transferred to JCADC's A-Pod and placed in cell A512. Ex. 9 [125-9] at 3.

2

Plaintiff alleges that on September 9, 2018, Arnold's medical condition was ignored by the JCADC's jailors, 1st. Am. Compl. [29] at 12-14, and that she was not provided with insulin or any other medication despite her repeated requests, *id*. 12-13. Arnold was also allegedly deprived of food. *Id*. at 14. The pleadings assert that Arnold appeared to have scattered her breakfast tray across her cell and Defendant Officer Jamie Weeks allegedly did not offer her a tray of food at lunch time. *Id*.

According to the summary judgment record, Defendants contend that after lunch on September 9, Officer Weeks responded to a call from Arnold's cell and Arnold stated that she needed to go to the hospital. Ex. 9 [124-9] at 3. Officer Weeks notified the onsite medical staff and escorted Nurse Luerether Willis to Arnold's cell, *id.*, but Arnold was uncooperative during both Nurse Willis's initial and subsequent visits, *id*; Ex. 7 [124-7] at 4. Arnold refused to allow Nurse Willis to take her blood-sugar, and Nurse Willis indicated that she did not believe Arnold was suffering from a blood-sugar related issue based on her behavior. Ex. 7 [124-7] at 4.

At 5:00 p.m. on September 9, Defendant Corporal Kristofer Gray observed Arnold "naked on her bunk, with her legs spread, and she appeared to be masturbating." Ex. 9 [126-9] at 3. Between 5:00 and 7:00 p.m., Officer Christy Maas responded to a call from Arnold's cell where she observed Arnold naked and sitting on the floor, but she did not believe Arnold was in "any medical distress." Ex. 2 [112-2] at 3. At the 10:00 p.m. headcount, Officer Jeremy Bobo knocked on Arnold's cell door several times but got no response. Ex. 6 [123-6] at 3. Officer Bobo observed Arnold lying on a mat on the floor of her cell under her bunk, but because she

appeared to still be naked, he did not enter the cell. *Id.* Instead, he contacted Officer Maas, a female officer, to check on Arnold. *Id.* Officer Bobo did not confirm that anyone entered Arnold's cell, but believed that someone told him that Arnold was eventually responsive. *Id.*

At approximately 11:40 p.m., Officer Chad Vidrine was making his first post-10:00 p.m. headcount round and claims that he observed Arnold through her cell window take a deep breath. Ex. 9 [125-9] at 3-4. A little after midnight on September 10, 2018, Officer Vidrine saw Arnold's hand move while making his second post-headcount round. *Id.* at 4. At approximately 1:45 a.m., Officer Vidrine peered into Arnold's cell and saw no movement. *Id.* He asserts that he immediately contacted Officer Maas, who was making rounds on the upper tier, to assist him and called central control to open the cell door. *Id.* Officers Vidrine and Maas then entered Arnold's cell and pulled her out from under her bed. *Id.* They checked for a pulse and could not detect one. Ex. 3 [125-3], Officer Maas's MBI Interview, at 6:11:50-6:13:05. Shortly thereafter, Corporal Amanda Shepperson arrived and directed them to begin chest compressions, which they continued doing until paramedics arrived. Ex. 3 [125-3], Corporal Shepperson's MBI Interview, at 7:08:09-7:08:15; Ex. 9 [125-9] at 4. Arnold was pronounced dead shortly thereafter. Ex. 9 [125-9] at 4.

B.   Procedural history

Plaintiff Kayla Rush ("Plaintiff" or "Rush"), as the daughter and wrongful death beneficiary of Cindy Arnold ("Arnold"), initiated this suit on September 6,

2019, advancing four causes of action against ten Defendants, including Officer Cendall Huynh, Officer Jamie Weeks, Officer Chad Vidrine, and Sergeant James McCoy. Compl. [1]. Plaintiff filed a First Amended Complaint [29] on February 10, 2020, naming three additional Defendants, including Officer Jeremy Bobo and Corporal Kristofer Gray. 1st Am. Compl. [29].

The First Amended Complaint alleges that Arnold died in the JCADC on September 10, 2018, as a result of Defendants' failure to provide medical assistance. *See id.* at 10-17.  With respect to Defendant Officers Jamie Weeks, Jeremy Bobo, Chad Vidrine, and Corporal Kristofer Gray, the First Amended Complaint alleges that each "were corrections officers working in Zone 5 of the Lockdown Unit where [Arnold] was detained" and that "each breached, ignored, or did not follow jail protocol for doing inmate status rounds." 1st Am. Compl. [29] at 12. Plaintiff claims that Defendant Officer Cendall Huynh was the officer who booked Arnold in to the JCADC and conducted a medical intake screening exam which revealed Arnold had various health conditions. *Id.* at 11. Finally, with respect to Defendant Sergeant James McCoy, the First Amended Complaint asserts that he was the Shift Sergeant on duty at the JCADC. *Id.* at 6. According to Plaintiff, each Defendant "demonstrated deliberate indifference to [Arnold's] serious medical needs." *Id.* at 17.

Defendants Sergeant James McCoy, Officer Cendall Huynh, Officer Jamie Weeks, Officer Jeremy Bobo, Officer Chad Vidrine, and Corporal Kristofer Gray (collectively "Defendants") have filed separate Motions for Summary Judgment on grounds of qualified immunity. Mot. [98]; Mot. [100]; Mot. [102]; Mot. [104]; Mot.

5

[108]; Mot. [110].  Plaintiff has responded to each Motion and takes the position that she has set forth evidence demonstrating that there are genuine issues of material fact as to whether each Defendant violated clearly established law and whether each Defendant acted reasonably. *See generally*, Resp. [117][118][124][123][125][126]. Each Defendant has filed a Rebuttal memorandum to Plaintiff's Responses.[1] Mem. [129][131][136][134][138][140].

## II. DISCUSSION

A.   Relevant legal standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018). If the movant carries this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). "An issue is material if its resolution could affect the outcome of the action." *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001).

---

[1] In their Rebuttal memoranda Defendants object to the evidence offered by Plaintiff in support of her Responses [118][124][123][125][126] in Opposition to each of their Motions [100][102][104][108][110]. Specifically, they contend that the Jackson County Sheriff's Department's Investigative Report, the JCADC Booking Sheets, the Interviews conducted by Mississippi Bureau of Investigation ("MBI") Officer Stephen Beale, Arnold's medical records, and the MBI Investigative Report are all inadmissible evidence. *See, e.g.*, Mem. [130] at 2 (arguing that only one of Plaintiff's exhibits is admissible; *see also* Ex. 1, 2, 3, 4, 5, 6, and 7 [118-1, 2, 3, 4, 5, 6, and 7]. The Court concludes that even if it considers this evidence in support of Plaintiff's Responses, this would not alter the Court's conclusions.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The qualified immunity analysis involves two prongs: (1) "whether an official's conduct violated a constitutional right of the plaintiff," and (2) "whether the right was clearly established at the time of the violation." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). A good faith assertion of qualified immunity alters the usual summary judgment burden of proof, *id.* (citing *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005)), and the plaintiff bears the burden of "establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law . . . but all inferences are drawn in his favor," *id.*

The United States Court of Appeals for the Fifth Circuit has explained that the second prong of the qualified immunity analysis encompasses "two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendant was objectively unreasonable in the light of that clearly established law." *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998) (*Hare II*). A right is clearly established if every "reasonable officer would understand that what [she] is doing violates that right." *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Supreme Court has cautioned, however, that the clearly established right must not be defined at too high a level of generality. *See al-Kidd*, 563 U.S. at 742.

The Fourteenth Amendment to the United States Constitution affords pretrial detainees the right to receive medical care. *Baldwin*, 964 F.3d at 326; *Brumfield v. Hollins*, 551 F.3d 322, 327 (5th Cir. 2008) ("Pretrial detainees have a constitutional right to medical care . . . ."). In order to prove a violation of this right, a plaintiff must demonstrate that a defendant acted with deliberate indifference to the pretrial detainee's serious medical needs. *Domino v. Tex. Dept. of Crim. Just.*, 239 F.3d 752, 754 (5th Cir. 2001). An official is deliberately indifferent when he is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). For the latter part of this test, a prison official acts with deliberate indifference "only if . . . he knows that inmates face a substantial risk of serious bodily harm and . . . he disregards that risk by failing to take reasonable measures to abate it." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Farmer*, 511 U.S. at 487). When an official's actions and decisions "are merely inept, erroneous, ineffective, or negligent" they do not rise to level of deliberate indifference. *Alton v. Texas A & M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999).

With respect to the right to receive medical care, a plaintiff must demonstrate that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). "Unsuccessful

medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346.

B.   Analysis

1.   Plaintiff's claims against Defendant Sergeant James McCoy

Plaintiff asserts that Sergeant McCoy, as the night shift supervisor during Arnold's detention, allegedly "demonstrated deliberate indifference to . . . [Arnold's] serious medical needs" and through his actions caused Arnold to suffer pain, discomfort, disfigurement, and death. 1st Am. Compl. [29] at 6, 17-18; Resp. [117] at 14. In an Interrogatory propounded by Sergeant McCoy, Plaintiff was asked to provide a "full and complete description of all conduct or action[s] which you claim constituted such a [constitutional] violation." Ex. 1 [98-1] at 5. Plaintiff's sworn response was as follows:

> [o]n information and belief, Defendant McCoy is named in the 1st Amended Complaint as a CO or supervisor who knew or should have had knowledge of the treatment of the Decedent and the denial of her medical needs in such a manner that violated the clearly established laws on providing adequate care for pe [sic] pre-trial detainees. McCoy either had contact or directed other CO's who had contact with . . . Arnold and with the Jail nursing staff. McCoy's acts are described in the 1st Amended Complaint.

*Id*.

Sergeant McCoy argues that he is entitled to summary judgment because Plaintiff "has failed to offer any evidence that [he] participated in any acts that caused the alleged constitutional deprivation of . . . Arnold's rights" and "[e]ven if Plaintiff could establish a constitutional violation . . . he would nevertheless be

entitled to qualified immunity because his actions were objectively reasonable."
Mot. [98] at 2.

In response to Sergeant McCoy's properly supported Motion, Plaintiff has not
submitted competent summary judgment evidence of any personal interaction
between Arnold and Sergeant McCoy. Instead, the majority of Plaintiff's Response
[117] in Opposition recounts allegations against other JCADC employees. Resp.
[117] at 1-13. The only mention of Sergeant McCoy is that he was "the night shift
supervisor of the JCADC" and "was responsible for the direction and duties of the
12 deputies under his supervision." *Id*. at 14. Plaintiff's Response [117] also, for the
first time, makes the vague and conclusory claim that Sergeant McCoy failed "to
implement and enforce the policy of the jail" and that he is "responsible for the non-
performance of his subordinates." *Id*. The only relevant evidence Plaintiff cites in
her Response [117] is Sergeant McCoy's answers to Plaintiff's Interrogatories. *See*
Ex. 8 [117-8]. Based on this evidence, Plaintiff argues that she has demonstrated "a
genuine issue of material fact as to whether the wrongful conduct of the [j]ail and
staff violated clearly established law." *Id*. at 14-15.

Based upon the summary judgment record, Plaintiff has not demonstrated
that Sergeant McCoy acted with deliberate indifference to Arnold's rights, and he is
entitled to summary judgment. Plaintiff has not pointed the Court to any evidence
in the record that Sergeant McCoy had any personal knowledge of Arnold's medical
conditions or of any other facts from which he should have been aware of a
substantial risk to Arnold's health. There is no evidence in the summary judgment

10

record indicating that Sergeant McCoy was aware of Arnold's medical conditions during her detention, and Plaintiff has not set forth any evidence of any particular acts or omissions on his part that would establish deliberate indifference.

During discovery Plaintiff was asked to describe the specific conduct by Sergeant McCoy that purportedly violated Arnold's rights and she responded with conclusory assertions and referred to the allegations in the First Amended Complaint [29]. Ex. 1 [98-1] at 5. This is insufficient at the summary judgment stage because "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Bargher v. White*, 928 F.3d 439, 444 (5th Cir. 2019) (quoting *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996)). None of the other evidence in the record points to Sergeant McCoy playing any role in the medical care, or the lack of, that Arnold received. As such Plaintiff has not carried her summary judgment burden of demonstrating a material fact question for trial on whether Sergeant McCoy acted with deliberate indifference to Arnold's constitutional rights.

Further support for this conclusion is found in Sergeant McCoy's sworn response to Plaintiff's Interrogatories. *See* Ex. 8 [117-8]. Sergeant McCoy stated that he "did not interact with . . . Arnold during [her detention], and was not aware of her having a medical emergency until she was discovered unresponsive" on September 10, 2018. *Id.* at 7. Plaintiff has presented no competent evidence to contest the veracity of these statements. *Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.*, 336 F.3d 410, 413 (5th Cir. 2003) (holding that the court may

give credence to the moving party's evidence "that is uncontradicted and unimpeached"). Viewing the summary judgment record as a whole in the light most favorable to Plaintiff, there is no genuine issue of material fact as to whether Sergeant McCoy violated Arnold's clearly established rights.

Nor has Plaintiff shown that Sergeant McCoy can be held liable as a supervisor under § 1983. She argues in her Response [117] that Sergeant McCoy is responsible for the purported violations of jail policy by various Jackson County deputies, Resp. [117] at 14, but as a supervisory official Sergeant McCoy cannot be held vicariously liable for the actions of subordinates, *see Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). In his role as a supervisor, Sergeant McCoy can only be held liable if "he affirmatively participated in the acts that cause the constitutional deprivation," or "he implements unconstitutional policies that causally result in the constitutional injury." *Gates v. Tex. Dept. of Protective and Regul. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008).

Plaintiff has produced no competent summary judgment evidence that Sergeant McCoy affirmatively participated in the events in question, or that he qualified as a policymaker or instituted any policies at all. In addition, Plaintiff did not advance a supervisory claim against Sergeant McCoy in her complaint and has only now raised this claim in her Response. *See* 1st Am. Compl. [29] at 17 (asserting only a failure to provide adequate medical treatment claim against Sergeant McCoy); Resp. [117] at 14. The Fifth Circuit has held that "[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for

12

summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)). As such Sergeant McCoy is entitled to summary judgment on any supervisory liability claim. *Id*. at 114.

2.    Plaintiff's claims against other officers

a.    Officer Cendall Huynh

The First Amended Complaint [29] alleges that Officer Huynh was deliberately indifferent to Arnold's serious medical needs based upon his interactions with Arnold when he booked her into the jail. 1st Am. Compl. [29] at 17. Specifically, Plaintiff asserts that when Officer Huynh booked Arnold, he conducted a medical intake screening which revealed that she was a Type 1 insulin-dependent diabetic. *Id*. at 11. Plaintiff claims that "[d]espite this knowledge, . . . Arnold was deprived of medication necessary to treat her diabetes." *Id*.  In an Interrogatory propounded by Officer Huynh, Plaintiff was asked to give a "full and complete description of all conduct or action[s] which you claim constituted such a [constitutional] violation," to which she responded by merely referring to the allegations in the First Amended Complaint [29] and stating that Officer Huynh "had contact with . . . Arnold and the jail nursing staff." Ex. 1 [100-1] at 5.

Officer Huynh seeks summary judgment on grounds that Plaintiff has not demonstrated that he acted with deliberate indifference to Arnold's constitutional rights and, even if she has, he acted reasonably under the circumstances. Mem. [101] at 7-8. In support of his Motion, Officer Huynh submitted his sworn responses

13

to Plaintiff's Interrogatories in which he detailed his interactions with Arnold. *See* Ex. 2 [100-2]. According to Officer Huynh, he asked Arnold the standard intake questions about her medical history and any current medical issues. *Id.* at 3. Arnold informed Officer Huynh that she was a diabetic and that she had "seizures, epilepsy, heart problems, and a blood clot in her leg." Ex. 2 [100-2] at 4. She also advised Officer Huynh that she took medication, but she was unable to provide him with the names of any of her medications. *Id.* Officer Huynh noted that Arnold appeared to be under the influence of an unknown substance and that he had "to ask her the same question several times in order to obtain any information." *Id.* Officer Huynh completed the booking process and attempted to escort Arnold to pre-classification, but she was non-compliant and refused to walk, which forced him utilize hand restraints and place her in an isolation cell. *Id.* The record indicates that this was the extent of Officer Huynh's direct contact with Arnold.

In response, Plaintiff raises two issues which she asserts create a genuine issue of material fact as to whether Officer Huynh violated a clearly established right and whether he acted unreasonably. Resp. [118] at 14-15. Plaintiff first argues that Officer Huynh omitted facts from his response to Plaintiff's Interrogatories by failing to mention that he observed Defendant Corporal Kristofer Gray tap on Arnold's cell during the 10:00 p.m. headcount on September 9. Resp. [118] at 14; Ex. 6 [118-6] at 3. During the subsequent death investigation conducted on behalf of the Jackson County Sheriff's Department, Officer Huynh told Sergeant Tracy Odom that he was present in A-Pod where Arnold was detained during the 10:00 p.m.

14

headcount as an observer and witnessed Defendant Gray tap on Arnold's cell window. Ex. 6 [118-6] at 3. Plaintiff maintains that Corporal Gray's actions were a violation of jail policy and that Officer Huynh did not report this violation or take any other corrective action. Resp. [118] at 14.

Plaintiff also contends that Officer Huynh purposely chose not to view Arnold's medical records when he booked her into the JCADC. *Id.* In an interview conducted by Agent Stephen Beale of the Mississippi Bureau of Investigation, Officer Huynh stated that he did not view Arnold's jail medical history during the booking process, but instead started "a new medical." Ex. 3 [118-3], Officer Huynh's MBI Interview, at 7:23:35-7:23:50. Arnold had been incarcerated at the JCADC on several prior occasions, and her jail medical records indicated that she was a Type 1 diabetic and had received medication for this issue during her previous periods of confinement. Ex. 5 [118-5] at 7-20, 104-120 (detailing her diagnosis and medical treatment for her diabetes during two different periods of confinement at the JCADC). Plaintiff contends that Officer Huynh's failure to review Arnold's jail medical records led to Arnold's condition going "unrecognized" by the JCADC. Resp. [118] at 14-15.

The Court finds that Plaintiff has failed to establish that Officer Huynh acted with deliberate indifference to Arnold's constitutional rights because she has not produced sufficient evidence that Officer Huynh acted with wanton disregard for Arnold's serious medical needs. *See Gobert*, 463 F.3d at 346. "A serious medical

need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Id*. at 354 n.12.

Although Arnold did inform Officer Huynh that she suffered from several medical conditions, including diabetes, Plaintiff has not produced any evidence that at the time Officer Huynh interacted with Arnold there was any indication that any medical care was required. Ex. 8 [118-8] at 4. Arnold appeared to be in an intoxicated state during the booking process, but the summary judgment record is uncontested that Officer Huynh did not otherwise recognize any indicators that Arnold was in medical distress. *Id*. Furthermore, the record appears uncontroverted that Officer Huynh had no prior personal knowledge of Arnold's health conditions or of any prescription medications she took. *Id*.

At most, the evidence set forth by Plaintiff demonstrates that Officer Huynh acted negligently, which is insufficient to prove deliberate indifference. *Grogan v. Kumar*, 873 F.3d 273, 278 (5th Cir. 2017) (citing *Gobert*, 463 F.3d at 346). In this context the Fifth Circuit has defined negligence as acting "without the due care a reasonable person would use." *Hyatt*, 843 F.3d at 178. Officer Huynh admitted that he did not review Arnold's jail medical history, but nothing in the record indicates that he did so with the subjective intent to harm Arnold. In fact, the record indicates that Officer Huynh took steps to ensure that the medical staff were made aware of Arnold's conditions. Ex. 8 [118-8] at 3-4. He entered Arnold's medical information into JCADC management system so that the medical staff could access it and provide her with the proper medication. *Id*. Even if a reasonable person

would have inquired further and reviewed Arnold's previous medical history, this alone is insufficient to establish that Officer Huynh was aware of a "substantial risk of serious bodily harm and . . . disregard[ed] that risk by failing to take reasonable measures to abate it." *Gobert*, 463 F.3d at 346.

Nor does Officer Huynh's alleged failure to follow protocol rise to the level of deliberate indifference. The Fifth Circuit has held that "violations of prison rules do not alone rise to the level of constitutional violations and, therefore, such claims are not actionable under § 1983." *Scheidel v. Sec'y of Pub. Safety & Corr.*, 561 F. App'x 426, 427 (5th Cir. 2014) (citing *Hernandez v. Estelle*, 788 F.2d 1154, 1158 (5th Cir. 1986)). Thus, even if Plaintiff were able to produce evidence of a specific jail policy, which she has not, that Officer Huynh violated by failing to report Corporal Gray's alleged procedural violation, this would not rise to the level of deliberate indifference. Officer Huynh is entitled to summary judgment.

b.   Officer Jamie Weeks

Plaintiff alleges that Officer Weeks was "a corrections officer working in Zone 5 of the Lockdown Unit at the [JCADC]" where Arnold was detained and that he "breached, ignored or did not follow jail protocol for doing inmate status rounds." 1st Am. Compl. [29] at 12. She further claims that Officer Weeks was responsible for distributing lunch trays to inmates in the Lockdown Unit and was informed by prison inmate Olivia Reynolds that Arnold "probably needed to eat something because her blood sugar was low, and the [Correctional Medical Associates] agents were not giving her insulin." *Id*. at 14. Despite this warning, the First Amended

Complaint [29] claims that Officer Weeks "did not knock on . . . Arnold's cell or give her a lunch tray," which constituted deliberate indifference to Arnold's constitutional rights. *Id*. at 17.

Officer Weeks moves for summary judgment on grounds that "Plaintiff has failed to offer any evidence that [he] participated in any acts that caused the alleged deprivation of . . . Arnold's rights" and "[e]ven if Plaintiff could establish a constitutional violation . . . he would nevertheless be entitled to qualified immunity because his actions were objectively reasonable." Mot. [102] at 2. Officer Weeks described his interactions with Arnold in response to Plaintiff's Interrogatories as follows:

> [w]hen I went on duty, I was assigned to the area of the jail in which that zone is located. Ms. Arnold was ringing the intercom system stating that she needed to go to the hospital. I immediately notified the onsite medical staff of her request. I escorted the on-duty nurse to Ms. Arnold's cell for her to assess Ms. Arnold. Due to her erratic behavior, the nurse deemed Ms. Arnold uncooperative and stated she would return when Ms. Arnold calmed down. Another deputy and I escorted the nurse to Ms. Arnold additional times but Ms. Arnold remained uncooperative.

Ex. 9 [124-9] at 3. Officer Weeks argues that his conduct does not demonstrate deliberate indifference to Arnold's medical needs, but rather it "evince[s] care and an attempt to get [Arnold] medical assistance that she was requesting." Mem. [103] at 8.

In response, Plaintiff raises three issues which she maintains create a genuine issue of material fact as to whether Officer Weeks violated Arnold's clearly established rights. Resp. [124] at 14-17. She first points out that Officer Weeks was identified as the jailor who did not give Arnold her lunch tray on September 9. *Id*;

18

Ex. 4 [124-4], Inmate Reynolds' MBI Interview at 2:10-2:22. Inmate Reynolds stated that she informed Officer Weeks that "[Arnold] probably needed her food. She has been saying that she needed her insulin." Ex. 4 [124-4], Inmate Reynolds' MBI Interview at 2:08-2:13. Inmate Reynolds also stated that Officer Weeks did not give Arnold a food tray, because she was asleep. *Id*. at 2:15-2:20. Plaintiff asserts that this is "an issue of medical significance" because Arnold "was a known diabetic." Resp. [124] at 17.

Next, Plaintiff contends that Officer Weeks's statement to Sergeant Odom and his sworn response to Plaintiff's Interrogatories regarding how many times he escorted the nurse to Arnold's cell are inconsistent. *Id*. at 15. Officer Weeks stated in his sworn response to Plaintiff's Interrogatory 6 that he escorted the nurse to Arnold's cell on multiple occasions. Ex. 9 [124-9] at 3. However, in his interview with Sergeant Odom he stated that he was only with the nurse once. Ex. 6 [124-6] at 4.

Finally, Plaintiff argues that Officer Weeks's position that Arnold remained uncooperative after the initial nurse visit is contradicted by Inmate Reynolds. Resp. 124] at 17. According to Inmate Reynolds, Arnold was not being belligerent or combative when the nurse was escorted to her cell subsequent to the nurse's initial visit, and that it was the nurse who decided not to provide treatment to Arnold. Ex. 4 [124-4], Inmate Reynolds' MBI Interview at 5:08-5:23.

While the foregoing may create some factual disputes, they are not material ones sufficient to preclude summary judgment. Deliberate indifference is a high

standard which requires Plaintiff to show that Officer Weeks was "subjectively aware of a substantial risk of serious harm and failed to take reasonable measures to abate this risk." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996) (*Hare I*). Plaintiff has not presented competent summary judgment evidence that Officer Weeks was aware of a substantial risk to Arnold's health or that he deliberately disregarded this risk.

The record is undisputed that before their interactions on September 9, Officer Weeks had no prior knowledge of Arnold's health conditions. Ex. 9 [124-9] at 4. As such, the only evidence that Officer Weeks had any knowledge of Arnold's condition consists of Inmate Reynolds' statements and Arnold's request for medical attention. Ex. 4 [124-4], Inmate Reynolds' MBI Interview at 2:08-2:13; Ex. 9 [124-9] at 3. When Inmate Reynolds informed Officer Weeks that Arnold "probably needed her insulin," Arnold was sleeping and there was no other indication to Officer Weeks of any medical distress at that time. Ex. 4 [124-4], Inmate Reynolds' MBI Interview at 2:08-2:13. Even when Arnold later informed Officer Weeks that she needed to go the hospital, she was being "belligerent and difficult" and refused to allow the nurse to either take her blood sugar or blood pressure. Ex. 6 [124-6] at 4; Ex. 7 [124-7] at 4. Nothing about this behavior would signal to Officer Weeks that there was a substantial risk to Arnold's life. The record evidence is insufficient to establish that, as a non-medically trained individual, Officer Weeks knew that Arnold was suffering from an excessive risk to her health or that he deliberately disregarded that risk. *See Cleveland v. Bell*, 938 F.3d 672, 676-77 (5th Cir. 2019)

(holding that the plaintiffs could not demonstrate a constitutional violation where the record lacked evidence that the defendant was subjectively aware of a substantial risk of serious harm to the inmate).

Moreover, the record indicates that when Officer Weeks received information that Arnold was requesting medical treatment, he escorted the on-duty jail nurse to Arnold's cell, but it is undisputed that Arnold was not cooperative. Ex. 9 [124-9] at 3; Ex. 4 [124-4], Inmate Reynolds' MBI Interview, at 6:15-6:20 (describing Arnold as "pretty aggravated" during the nurse's first two visits to Arnold's cell). Officer Weeks took steps to ensure that a licensed medical professional saw to Arnold's needs. *See, e.g.,* Ex. 9 [124-9] at 3 ("[o]nly the medical staff may provide inmates with prescription medication."). As Officer Weeks argues, his actions demonstrate that he attempted "to get [Arnold] medical assistance that she was requesting." Mem. [103] at 8; *see also Mayfield v. King*, No. 9:16-CV-20, 2017 WL 4295256, at *4 (E.D. Tex. Aug. 10, 2017) (finding that the plaintiff failed to state claim against jailors who followed protocol by contacting the jail's medical personnel who was responsible for administering medication). The fact that he was unable to prevent the ultimate harm is insufficient to establish liability on his part. *Longoria v. Tex.*, 473 F.3d 586, 593 (5th Cir. 2006) (citing *Farmer*, 511 U.S. at 844).

Nor does Officer Weeks's alleged failure to provide Arnold with a lunch tray rise to the level of deliberate indifference. At most, Officer Weeks's actions in this regard were negligent because he did not purposefully deprive Arnold of her food, but elected not to give her a lunch tray because she was sleeping. Ex. 4 [124-4],

21

Inmate Reynolds' MBI Interview at 2:08-2:13. Assuming Officer Weeks arguably should have taken additional steps to ensure that Arnold received her food, his failure to do was merely negligent which is insufficient for § 1983 liability. *See, e.g., Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020) (holding that the defendants' actions "in not taking further steps to treat" the deceased after examining him was merely negligent conduct).

Finally, Plaintiff's arguments with respect to the reliability of Officer Weeks's statements do not create material fact issues sufficient to preclude summary judgment. Whether Officer Weeks escorted the nurse to Arnold's cell once or multiple times, and whether Arnold was combative when the nurse was escorted to Arnold's cell after the initial visit, are not material in determining whether Officer Weeks himself acted with deliberate indifference to Arnold's serious medical needs. Plaintiff has not shown the existence of a genuine issue of material fact as to whether Defendant Weeks violated Arnold's clearly established rights and he is entitled to summary judgment.

c.    Officer Jeremy Bobo

The First Amended Complaint [29] alleges that Officer Jeremey Bobo was "a corrections officer working in Zone 5 of the Lockdown Unit at the [JCADC]" where Arnold was detained and that he "breached, ignored or did not follow jail protocol for doing inmate status rounds." 1st Am. Compl. [29] at 12. Plaintiff alleges that Officer Bobo saw Arnold during the 10:00 p.m. headcount "in distress or

unresponsive and took inadequate or no steps to assist her," and that this violated

JCADC protocol. *Id*. at 15-16.

In response to an Interrogatory propounded by Plaintiff, Officer Bobo

described his first encounter with Arnold as follows:

> [t]he first was on 10/08/18 [sic], when she first came in, she was taken down to the BISO cell and placed there because she was severely agitated and was causing a disturbance in the booking area. She was also causing problems with other inmates in the preclassification area.

Ex. 9 [123-9] at 3. Officer Bobo described his second encounter with Arnold in a jail

incident report prepared shortly after Arnold's death:

> [o]n Sunday, September 9, 2018 at approximately 2200 hours, I . . . was calling out names for 2200 hour headcount when I came to A (Adam) 512 the cell of Inmate Arnold, Cindy. When I tried to wake her up with a knock on her cell door window, I tried a couple of times, I got no response from her so I first looked in at her and could see her laying on a mat on the floor of her cell and she look to not have her jump suit pulled up so I called to Deputy Maas, Christy #228 to come down and check on her.
>
> I continued on with the head count, and I did not see if anyone entered the cell but I did hear LCD (Lead Correctional Deputy) Gray, Kristoffer #207 knock on her cell door several times, after I had finished with the other inmates I did ask before leaving the day room if inmate Arnold had responded and I got a yes.

Ex. 3 [104-3] at 2. Officer Bobo argues that his actions do not establish that he acted

with deliberate indifference to Arnold's constitutional rights. Mem. [105] at 8.

Plaintiff raises two arguments which she maintains reveal a genuine issue of

material fact as to whether Officer Bobo violated a clearly established right. Resp.

[123] at 14-17. She first asserts that Officer Bobo intentionally chose not to check on

Arnold during the 10:00 p.m. headcount because she "was nude and he was

frustrated with her unresponsiveness." *Id*. at 15; Ex. 6 [123-6] at 3. Plaintiff

theorizes that if Officer Bobo had opened Arnold's cell door, rather than asking a female officer to check on her, "he would have found . . . Arnold in severe diabetic distress, gotten her help and she probably would not have died." Resp. [123] at 15.

Plaintiff next asserts that Officer Bobo's response to Plaintiff's Interrogatory 18 is "self-serving and inconsistent" with his statement to Sergeant Odom. *Id.* Interrogatory 18 asked Officer Bobo to describe any violations of jail policy or procedure by jail or medical personnel during Arnold's detention. Ex. 9 [123-9] at 8. Officer Bobo's sworn response was that he "did not witness any violations of policy or procedure of the ADC concerning the stay of . . . Arnold." *Id.* Plaintiff takes the position that this answer is inconsistent with Officer Bobo's statement to Sergeant Odom, because in that statement Officer Bobo purportedly admitted to violating jail policy. Resp. [123] at 16; Ex. 6 [123-6] at 3. Specifically, Officer Bobo told Sergeant Odom that he did not get a response from Arnold when he knocked on her cell door during the 10:00 p.m. headcount and that he was not sure if any one ever saw Arnold. Ex. 6 [123-6] at 3. He also stated that he "should have opened the cell door himself and checked on [Arnold]." *Id.* Plaintiff contends that these actions during headcount were violations of jail policy rendering his Interrogatory response inconsistent. Resp. [123] at 16.

First, Plaintiff has not directed the Court to, nor has it located any evidence that, Officer Bobo had any personal knowledge of Arnold's medical issues. This is insufficient to show Officer Bobo was subjectively aware of a substantial risk of

serious harm to Arnold and that he disregarded that risk. *See Hyatt*, 843 F.3d at 177.

The competent summary judgment evidence with respect to Officer Bobo reflects that he in fact had very limited interaction with Arnold, and nothing that occurred during those interactions would allow him to draw an inference that Arnold was in medical distress. Specifically, Officer Bobo observed Arnold shortly after she arrived at the JCADC and noted that she was in an agitated state. Ex. 9 [123-9] at 3. The next time Officer Bobo saw Arnold was not until the 10:00 p.m. headcount, when she was lying on the mat in her cell. Ex. 6 [123-6] at 2. Although he did not get a response from Arnold during the headcount, he was later told that she did respond to another officer. *Id*. Nothing about these interactions would be sufficient to alert Officer Bobo that Arnold was potentially facing a medical crisis. Plaintiff asserts, without citation to any evidence, that Arnold was "in medical distress" during the 10:00 p.m. headcount and that if Officer Bobo had acted "[Arnold] probably would not have died." Resp. [123] at 15. These unsubstantiated assertions are insufficient to carry Plaintiff's burden at this stage. *Freeman v. Tex. Dept. of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004) (stating that "the nonmovant cannot satisfy [their summary judgment] burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.").

Officer Bobo's failure to personally check on Arnold during the headcount is likewise insufficient to establish deliberate indifference. Plaintiff characterizes Officer Bobo's decision as intentional, Resp. [123] at 15, and he acknowledged in

retrospect that he should have checked on Arnold personally, Ex. 6 [123-6] at 3, but at most this is evidence of negligence which will not support liability under § 1983. *Adames v. Perez*, 331 F.3d 508, 514 (5th Cir. 2003) (holding that negligence is insufficient to support a finding of liability under § 1983). As the Court has stated, nothing in the summary judgment record indicates that Officer Bobo was subjectively aware of Arnold's medical condition. Without any awareness of an excessive risk to Arnold's health, Officer Bobo's failure to act does not establish deliberate indifference on his part. *Cleveland*, 938 F.3d at 676 (citing *Farmer*, 511 U.S. at 837-38).

Finally, Plaintiff's argument that Officer's Bobo's response to Plaintiff's Interrogatory 18 is self-serving and inconsistent with his other statements does not create a material fact question for trial. Plaintiff argues that Officer Bobo violated jail policy during the 10:00 p.m. headcount, but she has not cited to the specific jail policy that Officer Bobo purportedly violated. Resp. [123] at 16. Plaintiff merely relies on Officer Bobo's statement that, in retrospect, he should have checked on Arnold during the headcount to prove that he violated jail policy. *Id*. Even if Officer Bobo did violate jail policy this would not create a genuine issue of material fact because "violations of prison rules do not alone rise to the level of constitutional violations." *Scheidel*, 561 F. App'x at 427. Officer Bobo is entitled to summary judgment.

d.   <u>Officer Chad Vidrine</u>

The First Amended Complaint [29] alleges that Officer Chad Vidrine was "a corrections officer working in Zone 5 of the Lockdown Unit at the [JCADC]" where Arnold was detained and that he "breached, ignored or did not follow jail protocol for doing inmate status rounds." 1st Am. Compl. [29] at 12. According to the pleadings, Officer Vidrine allegedly had to be ordered to begin CPR and was present when Arnold was pronounced deceased. *Id*. at 15-16.

Officer Vidrine detailed his interactions with Arnold on the evening of September 9 and the early morning of September 10 in response to an Interrogatory propounded by Plaintiff, as follows:

> [t]o the best of my recollection, I did not interact with Ms. Arnold until I was working in A-Pod the night of September 9, 2018, when Ms. Arnold was housed in cell A512 in zone A5 in A-Pod. Before lockdown that evening, I attempted to talk with Ms. Arnold from outside her cell to see if she would put her jumpsuit on, which she had been refusing to wear. Ms. Arnold looked me in the eye but did not respond. I asked Ms. Arnold if she was alright, to which she didn't respond either. Determined to get some sort of response, I repeated the question until Ms. Arnold turned to her left, waved dismissively at me, and walked further into her cell. On my first round after headcount (at approximately 2340 hours), I saw Ms. Arnold take a deep breath as I observed her through the cell window. On my second round after headcount (approximately 0040 hours), I saw Ms. Arnold's hand move as I looked through her cell window. On my third round after headcount (approximately 01:45 hours), I did not see any movement from Ms. Arnold, so I called for Deputy Maas, who was making rounds on the upper tier. I called for central control to open Ms. Arnold's cell door and I entered her cell with Deputy Maas. Central control called for the nurse to meet us at the cell, and as we were waiting for the nurse, Deputy Maas and I pulled Ms. Arnold out from under her rack where she had been sleeping. When the nurse arrived, she checked Ms. Arnold's vitals. With no pulse being detected, Deputy Maas and I started chest compressions and continued doing them, switching off when necessary, until the

27

> emergency medical technicians arrived, took over the scene, and we
> were thereafter advised to stop compressions.

Ex. 9 [125-9] at 3-4. In support of his Motion [108] for Summary Judgment, Officer

Vidrine argues that his actions show "concern, not deliberate indifference" and that

Plaintiff has failed to put forth "any specific facts in support of her allegations that

[he] violated Plaintiff's constitutional rights." Mem. [109] at 8.

Plaintiff responds that there are two issues which create a genuine issue of

material fact regarding whether Officer Vidrine violated clearly established law.

She first contends that Officer Vidrine's statements about his checks on Arnold are

self-serving and highly suspect. Resp. [125] at 14-15. According to Plaintiff,

Sergeant Odom interviewed Officer Vidrine as part of his investigation into Arnold's

death and his statements to Sergeant Odom closely match his sworn Interrogatory

response referenced above. Resp. [125] at 10-11; Ex. 6 [125-6] at 3. But Officer

Vidrine also told Sergeant Odom that "at approximately 1820hrs an inmate buzzed

the monitor and told them that Arnold was in her cell on the ground shaking." Ex. 6

[125-6] at 3. According to Officer Vidrine, Officer Christy Maas checked on Arnold

and informed Officer Vidrine that Arnold was "okay." Ex. 3 [125-3], Officer Vidrine's

MBI Interview, at 6:30:00-6:32:00. In addition, as part of his investigation Sergeant

Odom discovered that Officer Vidrine had logged rounds that he did not perform.

Ex. 6 [125-6] at 3. Plaintiff contends that this is evidence that Officer Vidrine's

statements about his checks on Arnold are thus "self-serving" and "highly suspect."

Resp. [125] at 15.

Plaintiff also argues that Officer Vidrine's Interrogatory answers, taken as a whole, "are self-serving, demonstrably false and inconsistent with his statement given contemporaneously at the time of Arnold[']s death." *Id*. Specifically, she points to his response to Interrogatory 18 which asked Officer Vidrine to describe any violations of jail policy or procedure by jail or medical personnel during Arnold's detention. Ex. 9 [123-9] at 8. Officer Vidrine's sworn response was that he "did not witness any violations of policy or procedure of the ADC concerning the stay of . . . Arnold." *Id*. Plaintiff asserts that this statement is false because Officer Vidrine violated jail policy by logging rounds that he did not perform. Resp. [125] at 16.

The foregoing is insufficient to create a material fact question as to whether Officer Vidrine violated Arnold's clearly established constitutional rights because Plaintiff has not presented any evidence showing that Officer Vidrine was subjectively aware of and deliberately indifferent to Arnold's serious medical needs.

Plaintiff alleges in the First Amended Complaint [29] that Officer Vidrine had to be ordered to perform CPR. *See Grafton v. Bailey*, No. 13-2940, 2018 WL 2325410, at *10 (W.D. La. May 22, 2018) (acknowledging that the failure to perform CPR "could raise a jury question of deliberate indifference"). However, she has presented insufficient evidence at the summary judgment stage to support this claim, as the competent summary judgment evidence reflects that Officer Vidrine did not completely fail to perform CPR. When Officer Vidrine and Officer Maas found Arnold unresponsive they radioed for medical assistance and then checked Arnold's pulse. Ex. 3 [125-3], Officer Maas's MBI Interview, at 6:11:50-6:13:05

(stating that both officers checked Arnold's pulse and did not detect one). Officer Vidrine began chest compressions shortly thereafter when Corporal Amanda Shepperson arrived with the Automated External Defibrillator and told him to begin CPR. Ex. 9 [125-9] at 4; Ex. 6 [125-6] at 2; Ex. 3 [125-3], Corporal Shepperson's MBI Interview, at 7:08:09-7:08:15. Plaintiff has presented no evidence to dispute this version of events.

The undisputed evidence further reflects that there was only a short period of time between when Officer Vidrine discovered that Arnold was unresponsive and when he began CPR. The Fifth Circuit has recognized that a delay in medical care "can result in liability where there has been deliberate indifference, in that the officers were subjectively aware of the risk of serious harm but disregarded it." *Aguirre v. City of San Antonio*, 995 F.3d 395, 421 (5th Cir. 2021) (citation omitted) (affirming a district court's grant of qualified immunity to officers who did not begin CPR for 4 minutes and 30 seconds after discovering the inmate unresponsive). But a plaintiff must point to evidence that the officers "*knew* [their measures] were insufficient and intentionally failed to do more out of indifference to [the inmate's] well-being." *Id*. (emphasis in original). Plaintiff here has made no such showing, and the delay[2] in starting CPR is not sufficient to prove that Officer Vidrine acted with deliberate indifference to Arnold's serious medical needs. *See, e.g., Garza v. City of Donna*, No. 7:16-CV-00558, 2017 WL 6498392, at *14 (S.D. Tex. Dec. 15,

---

[2] While the exact timeframe is unclear, from both Officer Vidrine's and Officer Maas's accounts not much time elapsed between when they found Arnold unresponsive and when they began chest compressions. Ex. 9 [125-9] at 4; Ex. 6 [125-6] at 2; Ex. 3 [125-3], Officer Maas's MBI Interview, at 6:11:50-6:14:31.

30

2017) (holding that a thirty-second failure to administer CPR was insufficient evidence to prove that defendant was deliberately indifferent); *Hyatt v. Callahan Cnty.*, No. 1:14-CV-169-C, 2015 WL 12964681, at *7 (N.D. Tex. June 18, 2015) *aff'd sub nom. Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016) (finding that defendant did not act with deliberate indifference even though he did not perform CPR for approximately 10 minutes after discovering that the inmate had hung himself); *Stogner v. Sturdivant*, No. 10-125-JJB-CN, 2010 WL 4056217, at *4 (M.D. La. Oct. 14, 2010) (finding that the defendants were not deliberately indifferent to the inmate's medical needs where they waited around 2 minutes to begin CPR on the inmate after finding him unconscious*).*

Viewing the summary judgment evidence in the light most favorable to Plaintiff, there is arguably a fact question regarding whether Officer Vidrine actually performed all of the rounds that he claimed to have performed. Ex. 6 [125-6] at 3. However, the evidence is nevertheless insufficient to conclude that Officer Vidrine was subjectively aware of a substantial risk to Arnold's health and that he disregarded that risk. Even if Officer Vidrine did not perform all of the rounds he claims to have performed, nothing in the record indicates that he had any knowledge of Arnold's medical conditions before he found her unresponsive. He acknowledged that he was aware from what other officers had told him that they believed Arnold was "intoxicated" when she arrived at the JCADC. Ex. 3 [125-3], Officer Vidrine's MBI Interview, at 6:37:15-6:37:20. He was also aware that Officer Christy Maas personally checked on Arnold after an inmate informed Officer

31

Vidrine and Officer Maas that Arnold was lying on the ground shaking. Ex. 7 [125-7] at 2. However, at that time Arnold apparently informed Officer Maas that she was "okay," and this information was relayed to Officer Vidrine. *Id*.[3] The record appears uncontested that this is the extent of the information provided to Officer Vidrine about Arnold's condition until he found her unresponsive in her cell. Without any subjective knowledge of a risk to Arnold's health, Officer Vidrine cannot be said to have been deliberately indifferent to Arnold's medical needs and he is therefore entitled to summary judgment. *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001) ("To prove deliberate indifference, a pretrial detainee must show that the state official knew of . . . an excessive risk to the inmate's health . . . .").

e.   <u>Corporal Kristofer Gray</u>

Finally, with respect to Corporal Gray, the First Amended Complaint [29] claims that he was a "corrections officer working in Zone 5 of the Lockdown Unit at the [JCADC]" where Arnold was detained, and that he "breached, ignored or did not follow jail protocol for doing inmate status rounds." 1st Am. Compl. [29] at 12. Plaintiff further alleges that Officer Gray shined his flashlight into Arnold's cell during the 10:00 p.m. headcount, but he "did not enter the cell or request any medical assistance for . . . Arnold." *Id*. at 15.

Corporal Gray interacted with Arnold on a few occasions, and he described these events in response to Plaintiff's Interrogatories as follows:

> [o]n the night of September 9, 2018, at approximately 1700 hours, I observed Cindy Arnold naked on her bunk, with her legs spread, and

---

[3] Officer Vidrine stated that "[i]nmate was the one that reported Arnold was in her cell shaking" and that "Maas responded to the cell and Arnold told Maas that she was ok[ay]." Ex. 7 [125-7] at 2.

> she appeared to be masturbating. Shortly after midnight, when
> Deputies Christy Maas and Chad Vidrine radioed that they needed
> a nurse in A5 day room, I reported to the area and observed both
> deputies administering CPR/First Aid to Ms. Arnold.

Ex. 9 [126-9] at 3. Sergeant Odom interviewed Corporal Gray shortly after the

incident and he described another interaction with Arnold that occurred during the

10:00 p.m. headcount:

> LCD Gray stated that Deputy Jeremy Bobo was actually doing the
> count, and he was just observing.
> . . .
> He stated Deputy Bobo asked him to check on Arnold because she
> was nude, under the bunk, and not getting up. LCD Gray stated he
> went over to the cell but never looked inside, he stated he tapped on
> the window with his flashlight. He stated the reason for not looking
> in the cell was because he did not want to see her nude again. LCD
> Gray stated that he knows the proper procedure for headcount, but
> he did not follow the procedure that night. He stated they normally
> have inmates come out of their cell to be counted.

Ex. 6 [126-6] at 2-3. Corporal Gray moves for summary judgment and argues that

there is no evidence which indicates that he was deliberately indifferent to Arnold's

serious medical needs. Mem. [111] at 7.

Plaintiff raises what she claims are two issues that create a genuine issue of

material fact as to whether Corporal Gray violated a clearly established right. Resp.

[126] at 14-17. Plaintiff first points to Corporal Gray's statement about the 10:00

p.m. headcount and argues that he intentionally failed to check on Arnold during a

period in which she was in medical distress by choosing not to follow jail procedure.

*Id.* at 14-16.

Plaintiff further maintains that Corporal Gray's response to her

Interrogatory 18 is "either an obvious mistake, or possibly a grave untruth."

Specifically, this Interrogatory asked Corporal Gray to describe any violations of jail policy or procedure by jail or medical personnel during Arnold's detention. Ex. 9 [126-9] at 8. Corporal Gray's sworn response was that he "did not witness any violations of policy or procedure of the ADC concerning the stay of . . . Arnold." *Id.* Plaintiff contends that this is inconsistent with Corporal Gray's admission to Sergeant Odom that he did not follow proper procedure during the 10:00 p.m. headcount. Resp. [126] at 17. As such, Plaintiff argues that, as a whole, Corporal Gray's Interrogatory answers "are self-serving, likely a falsehood, and directly contradict" the statements given shortly after Arnold's death. *Id.*

Plaintiff essentially claims that Corporal Gray was deliberately indifferent to Arnold's medical needs because he failed to follow the headcount procedure. 1st Am. Compl. [29] at 15; Resp. [126] at 14-17. The Fifth Circuit has held that a failure to follow policy or procedure is negligent conduct and is insufficient to support a finding of deliberate indifference. *Jacobs v. West Feliciana Sheriff's Dept.*, 228 F.3d 388, 398 (5th Cir. 2000) (holding that a deputy's failure to follow the inmate check policy was negligent conduct); *Estate of Pollard v. Hood Cnty., Tex.*, 579 F. App'x 260, 265 (5th Cir. 2014) (holding that the jailers' failure to comply with the 15-minute checks policy for suicidal inmates was negligent conduct); *see also Fuentes v. Gomez*, No. 2:16-CV-390, 2018 WL 322161, at *7 (S.D. Tex. 2018 Jan. 8, 2018) (holding that the jailers' failure to require the inmate to present himself during roll call in violation of the jail's roll call policy was negligent conduct). Although Plaintiff has not presented any evidence of the actual headcount procedure that

34

Corporal Gray purportedly violated, Corporal Gray's admission that he did not follow the proper headcount procedure during the 10:00 p.m. headcount would at most only establish that he was negligent. This does not create a material fact question for trial.

Furthermore, Plaintiff has not demonstrated that Corporal Gray was subjectively aware of an excessive risk to Arnold's health. Plaintiff infers that Arnold was in medical distress during the 10:00 p.m. headcount, because she reportedly did not respond to Officer Bobo and was lying on the floor naked under her bunk. Resp. [126] at 16; Ex. 9 [126-9] at 3. This by itself is insufficient to show that Corporal Gray was subjectively aware that Arnold was experiencing a medical emergency. Plaintiff must prove "objective exposure to a substantial risk of serious harm." *Gobert*, 463 F.3d at 345. She has not satisfied this burden because Corporal Gray's observations during the 10:00 p.m. headcount were not sufficient to make him aware that Arnold had serious medical needs. The Fifth Circuit has held that evidence that a jailor did not check on an inmate after observing him naked and in an unusual position was not enough to show subjective deliberate indifference. *Gray v. Tunica Cnty., Miss.*, 100 F. App'x 281, 282 (5th Cir. 2004) (per curiam) (holding that a jailor was not deliberately indifferent when he did not enter an inmate's cell after observing him "unclothed and in a 'frog-like' position"). Based on the summary judgment record, the information available to Corporal Gray was insufficient to place him on notice of a serious medical risk or show that he acted with deliberate indifference to that risk.

35

III. <u>CONCLUSION</u>

To the extent the Court has not addressed the parties' remaining arguments, it has considered them and determined that they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendants James McCoy, Cendall Huynh, Jamie Weeks, Jeremy Bobo, Chad Vidrine, and Kristofer Gray's Motions [98][100][102][104][108][110] for Summary Judgment are **GRANTED**, and Plaintiff Kayla Rush's claims against Defendants James McCoy, Cendall Huynh, Jamie Weeks, Jeremy Bobo, Chad Vidrine, and Kristofer Gray are **DISMISSED WITH PREJUDICE**. Plaintiff Kayla Rush's claims against Defendants Jackson County, Comprehensive Medical Associates, Inc., and Nurse Violet Smith will proceed.

**SO ORDERED AND ADJUDGED**, this the 29th day of September, 2021

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE